# In the United States Court of Federal Claims

No. 14-877 C
Filed: August 24, 2016
PUBLIC VERSION*

| | |
|---|---|
| ****************************************** | Administrative Procedures Act |
| * | ("APA"), 5 U.S.C. § 706; |
| AGUSTAWESTLAND NORTH AMERICA, * | Bid Protest Jurisdiction, |
| INC., * | 28 U.S.C. § 1491; |
| * | Competition In Contracting Act |
| Plaintiff, * | ("CICA"), 10 U.S.C. § 2304(a); |
| * | 10 U.S.C. § 2305(a)(1); 31 U.S.C. |
| v. * | § 3551 *et seq.*; |
| * | Deliberative Privilege; |
| THE UNITED STATES, * | Department of Defense Instruction |
| * | 5000.02 (Operation of the Defense |
| Defendant, * | Acquisition System); |
| * | Federal Acquisition Regulation |
| and * | ("FAR") 6.302-1 (Sole Source |
| * | Procurement); 6.303 (Justification); |
| AIRBUS HELICOPTERS, INC., * | 6.304 (Approval of the |
| * | Justification); 17.207(f) (Exercise of |
| Defendant-Intervenor. * | Options); |
| * | Rules of the United States Court of |
| ****************************************** | Federal Claims ("RCFC") 8(a)(1) |
| | (Pleading Requirements); RCFC |
| | 12(b)(1) (Jurisdiction); 12(b)(6) |
| | (Failure To State A Claim); 12(f) |
| | (Motion To Strike); RCFC 15(d) |
| | (Supplemental Pleadings); RCFC |
| | 52.1 (Administrative Record); 52.2 |
| | (Remand); RCFC 65(a) |
| | (Preliminary Injunction). |

**Neil H. O'Donnell**, Rogers Joseph O'Donnell, PC, Washington, D.C., Counsel for Plaintiff.

**Anthony F. Schiavetti**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Thomas L. McGovern, III**, Hogan Lovells US LLP, Washington, D.C., Counsel for the Defendant-Intervenor.

    \* On August 15, 2016, the court forwarded a sealed copy of this Memorandum Opinion And Order to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors requiring correction. On August 22, 2016, the parties filed proposed revisions and redactions. On August 24, 2016, the court issued an unredacted and revised version of this Memorandum Opinion And Order, under seal. That same day, the court also issued a public redacted and revised version.

**MEMORANDUM OPINION AND ORDER ENJOINING THE ARMY'S DESIGNATION OF THE UH-72A LAKOTA HELICOPTER AS *THE* ARMY'S "INSTITUTIONAL TRAINING HELICOPTER" AND DECEMBER 10, 2015 PROPOSAL TO PURCHASE ADDITIONAL UH-72A LAKOTA HELICOPTERS, WITHOUT "FULL AND OPEN" COMPETITION**

**BRADEN,** *Judge.*

On April 3, 2014, the Army issued Executive Order 109-14 that, in part, "standardized" on Airbus Helicopter, Inc.'s UH-72A Lakota helicopter as the "only one responsible source" for future training helicopter purchases. Pursuant to that Executive Order, on December 10, 2015, the Army filed a Justification and Approval ("J&A") to purchase 16 additional UH-72A Lakota helicopters and associated services for $[REDACTED]—without "full and open competition." The court has been advised that the Army also intends to purchase an additional 97 training helicopters for FY18, subject to congressional appropriations but will not commit whether any of these potential purchases will be subject to "full and open competition." ECF No. 96, at 3; ECF No. 96-1, at 3–4; AR Tab 70, at 5279. Previously, the Army has purchased approximately 400 of the UH-72A Lakota helicopters for approximately $3.2 billion under a 2006 Contract that was subject to "full and open competition." AR Tab 3zh, at 2126.

For the reasons discussed herein, the court has issued a preliminary injunction and remanded this matter to the Army for six months to: (1) proceed with a competitive procurement; (2) reissue a new Justification and Approval For Other Than Full And Open Competition, correcting the deficiencies identified herein and conducting a new Independent Government Estimate; or (3) not proceeding with this procurement. *See Fla. Power & Light Co. v. Horizon* 470 U.S. 729, 744 (1985).

## I.     RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY.[1]

On June 22, 2005, the United States Army ("Army") issued an Acquisition Strategy to procure 322 Light Utility Helicopters ("LUH") by full and open competition. AR Tab 1, at 1–5, 16–17.

---

[1] The facts discussed herein were derived from:  the February 1, 2016 Supplemental Complaint ("Supp. Compl.") and attached Plaintiff's Exhibits ("Pl. Exs. 2–32," comprising pages 1–182), to which the Government did not object; the February 17, 2016 Administrative Record ("AR Tabs 1–33," comprising pages 1–2923); the March 29, 2016 Supplemental Administrative Record ("AR Tabs 34–44," comprising pages 2924–3794); the March 29, 2016 Declaration of David R. Cheney II, Lieutenant Colonel, United States Army, ECF No. 71-1; Defendant-Intervenor's March 29, 2016 Exhibits A–G, J–M, ECF No. 70-1; the June 20, 2016 Affidavit of Shelley R. Muhammad, Special Competition Advocate ("SCA"), AR Tab 45, at 3795–97; the June 21, 2016 Supplemental Administrative Record ("AR Tabs 45–68," comprising pages 3795–5153); the Defendant-Intervenor's June 22, 2016 Notice Regarding UH-72 Technical Data ("6/22/16 Tech Not"); the June 30, 2016 Declaration of Gregory W. Segraves, Technical Manager, Tecolote Research, Inc., ECF No. 116-1; the July 22, 2016 Supplemental Administrative Record ("AR Tabs

On July 26, 2005, the Army issued Solicitation No. W58RGZ-05-R-0519 ("2006 Solicitation") requesting bids, on a full and open competition and "best value" basis, for 26 low rate initial production ("LRIP") aircraft, "MEDEVAC [Medical Evacuation] B kits, hoist B kits, Contractor Logistic Support (CLS), *training*, Contractor Field Teams (CFT), engineering services and other supporting hardware and services." AR Tab 34, at 2924, 2926 (emphasis added). "Options will be included in the contract to cover ten years of requirements for hardware and services." AR Tab 34, at 2926.

On May 17, 2006, the Army issued a Statement of Work ("SOW"), defining the scope of the proposed procurement, as follows:

> A need exists for a helicopter that can provide reliable and sustainable general and administrative support in non-hostile, non-combat environments at reduced acquisition and operating and support costs. The missions of LUH are primarily light GS (to include aerial transport of key personnel, air movement of supplies, and maintenance support), Generating Force Medical Evacuation (MEDEVAC), reconnaissance, and *test and training support*. When the operational need arises, the LUH will facilitate the commander's ability to conduct disaster relief operations, civil search and rescue, augmentation of UH-60 MEDEVAC aircraft, counter drug operations, conduct of Homeland Security, and other mission requirements such as catastrophic emergencies and support to civilian agencies against internal threats or national emergencies if directed by the President. It has been determined that the intended mission of the replacement helicopter can best be satisfied through the acquisition of an aircraft that is Federal Aviation Administration (FAA) certified. The LUH is the Army's solution to meet these requirements.

AR Tab 34, at 3229, 3232 (emphasis added).

In response to the 2006 Solicitation, AgustaWestland North America, Inc. ("AgustaWestland") and EADS North America Defense Company ("EADS") submitted bids.

On June 30, 2006, EADS was awarded Contract No. W58RGZ-06-C-0194 ("2006 Contract") for $43,090,522. AR Tab 3, at 56. The 2006 Contract required that EADS provide a base quantity of 8 LRIP UH-72A Lakota helicopters, a modified version of EADS' commercial rotary helicopter, known as the EC-145. AR Tab 3, at 57; AR Tab 33, at 2920.

69–70," comprising pages 5154–5281); and the July 22, 2016 Declaration of Stephen O. Murphy, Lieutenant Colonel, United States Army, ECF No. 119-1.

In addition, the 2006 Contract provided that, during each Program Years ("PY") 2 through 10, the Army could exercise options to purchase up to a total of 483 UH-72A Lakota helicopters, as Court Exhibit A indicates:

**COURT EXHIBIT A**

|  | **Relevant Time Period** | **Number of Airbus UH-72A Lakota Helicopters** | **Est. Maximum Final Fixed Prices for Est. Quantities (per helicopter)** | **AR Cite** |
|---|---|---|---|---|
| Option 1 | 10/1/06 – 9/30/07 | 45 | $[REDACTED] | AR Tab 3, at 74 |
| Option 2 | 10/1/07 – 9/30/08 | 53 | $[REDACTED] | AR Tab 3, at 88 |
| Option 3 | 10/1/08 – 9/30/09 | 55 | $[REDACTED] | AR Tab 3, at 101–02 |
| Option 4 | 10/1/09 – 9/30/10 | 55 | $[REDACTED] | AR Tab 3, at 117–18 |
| Option 5 | 10/1/10 – 9/30/11 | 55 | $[REDACTED] | AR Tab 3, at 133 |
| Option 6 | 10/1/11 – 9/30/12 | 55 | $[REDACTED] | AR Tab 3, at 149 |
| Option 7 | 10/1/12 – 9/30/13 | 55 | $[REDACTED] | AR Tab 3, at 165 |
| Option 8 | 10/1/13 – 9/30/14 | 55 | $[REDACTED] | AR Tab 3, at 181–82 |
| Option 9 | 10/1/14 – 9/30/15 | 55 | $[REDACTED] | AR Tab 3, at 199 |

The last date that the Army could exercise an option was on September 30, 2015. AR Tab 3, at 199. The 2006 Contract expired on June 30, 2016. AR Tab 3, at 56.

On October 23, 2006, the General Accountability Office ("GAO") denied a bid protest filed by AgustaWestland challenging the 2006 Contract award to EADS. ECF No. 14, at 3.

In January 2012, the President and Secretary of the Department of Defense announced a new Strategic Guidance, requiring a reduction in the Defense Budget and resizing/reshaping of the Armed Services to comply with the Budget Control Act of 2011. AR Tab 69A, at 5154–55. As a result of "budgetary constraints and fiscal uncertainty" the Army was required to "shape its force structure to reduce costs and ensure [that] it achieves further operational demand requirements." AR Tab 69A, at 5155. Thereafter, the Headquarters of the Defense Agency decided that a "supported aviation force restructure . . . can be transformed to meet these challenges." AR Tab 69A, at 5155.

On December 31, 2012, the Department of Defense issued a Selected Acquisition Report ("SAR"), concluding that helicopters assigned to the Army for "administrative and logistical missions," Homeland Security, and the Army National Guard "have reached their serviceable life limit and must be replaced." Pl. Ex. 8, at 1, 4. The SAR also stated that the UH-72A Lakota helicopter has performed well, but will be "deployed only to non-combat, permissive environments and is to conduct primarily three missions: medical and casualty evacuations, general support, and reconnaissance and surveillance." Pl. Ex. 8, at 4.

In April 2013, the Department of Defense FY14 President's Budget Submission reported that: "UH-72A [Lakota helicopters] will provide the flexibility to . . . support test and training

centers[.]" Pl. Ex. 31, at 1–2. At this time, the press reported that EADS had delivered over 250 UH-72A Lakota helicopters to the Army under the 2006 Contract. Pl. Ex. 9.

In May 2013, the Army's Annual Aviation Inventory and Funding Plan reported that a "new training helicopter requirement has not been defined by Army Aviation." Pl. Ex. 7, at 4. And, on May 16, 2013, the Department of Defense announced that it planned to halt the additional acquisition of UH-72A Lakota helicopters in 2014, because of sequester. Pl. Ex. 9, at 1.

In August 2013, however, the Army's Chief of Staff issued an Army Aviation Restructure Initiative ("ARI") "planning guidance" to implement the following objectives:

1) Sustain and modernize the Aviation fleet within a fiscally constrained environment.
   *       *       *
3) Replace the aging Aviation institutional training fleet at Fort Rucker.
4) Meet demand for Aviation assets at home and deployed.
5) Standardize Aviation brigade structure.

AR Tab 69A, at 5155.

The purpose of the ARI was

to deliver the best Army aviation force possible within resource constraints. The ARI design provides the Army with a modernized, ready, tailored Aviation force by divesting legacy systems, investing in modernization of Aviation best systems, drive to commonality and interoperability, and retains a lean force that is affordable to train. . . . Furthermore, the ARI design enhances efficient sustainment of the Aviation fleet by reducing aircraft types and standardizing Aviation brigade designs (AC and RC), managing the age of the aircraft, optimizing conditions based maintenance, and improving safety and survivability.

AR Tab 69A, at 5155.

A significant component of the ARI was a directive that the: "Institutional Training Helicopter fleet is converted to UH-72s," and "the legacy [Bell Helicopter] TH-67 training helicopter is divested." AR Tab 69A, at 5156. The ARI was to commence in FY14 and end in FY19. AR Tab 69A, at 5156.

On September 30, 2013, the Army sent a letter to EADS requesting pricing and availability of: (a) a Level III Technical Data Package, "defined as all technical data necessary to manufacture the basic UH-72A aircraft, components and subcomponents"; and (b) "[d]epot level work requirements." AR Tab 56, at 4619. On October 8, 2013, EADS declined to provide pricing for the Level III Technical Data Package and the depot level work requirements, requested by the Army. AR Tab 57, at 4621–22.

In January 2014, EADS changed its name to Airbus Group Inc. ("Airbus"). AR Tab 33, at 2915.

On January 10, 2014, Army officials advised the press that the Army planned "to retire its entire training fleet of TH-67s and replace those with LUH-72A Lakota helicopters." Pl. Ex. 11, at 1.

In March 2014, the Army's FY15 budget request advised Congress that the Army intended to purchase additional UH-72A Lakota helicopters to serve as the "primary training aircraft at the US Army Aviation Center of Excellence in Ft. Rucker." ECF No. 12, at 2; ECF No. 12-1, at 2.

On April 3, 2014, the Army issued Executive Order 109-14 that, in part, standardized on the UH-72A Lakota helicopter as *the* Army's "Institutional Training Helicopter" to implement the August 2013 ARI. ECF No. 119-1, at 2; AR Tab 69A, at 5156.

On May 19, 2014, the Army decided to increase the number of UH-72A Lakota helicopters purchased to date from Airbus by 110, *i.e.*, from 317 to 427, "to comply with a Congressional mark to the FY14 National Defense Authorization Act." AR Tab 9, at 2708.

In July 2014, the Army requested authorization from Congress to reprogram $110,790,000 to purchase 21 of the 110 additional UH-72A Lakota helicopters in FY14 and "transition[] to the [UH-72A Lakota] as [the Army's] rotary wing training helicopter." ECF No. 12, at 2; ECF No. 12-2, at 2.

A July 21, 2014 press report indicated that the Army's "original plan was to take 100 LUHs from the active Army and 100 from the [Army National] Guard, [but after the Guard objected], the Army agreed to buy 100 more Lakotas from Airbus for about $800 million—55 LUH-72s in FY-15 and 45 in FY-16—to fill the training base rather than take some Lakotas from the Guard." Pl. Ex. 12, at 1.

On August 21, 2014, the Army advised Congress that it needed to reprogram funds to purchase 17 additional UH-72A Lakota Light Utility Helicopters. *See* U.S. DEPARTMENT OF DEFENSE, OMNIBUS 2014 PRIOR APPROVAL REQUEST – REVISED (2014), at 4, *available at* http://comptroller.defense.gov/Portals/45/Documents/execution/reprogramming/fy2014/prior141 5s/14-11_R_PA_Omnibus_2014_Request_Final.pdf ("DoD 2014 Reprogramming Request").[2] Congress also was informed that the "Army is transitioning to the LUH as its rotary wing training helicopter." *Id.* Congress, however, was not told of the Army's "only one responsible source" or standardizing decision and that the purchase of these 17 UH-72A Lakota helicopters would not be subject to competition. The Army stated that this would produce "cost savings [that] will be achieved by meeting the economic order quantity in FY 2014 and by reducing the number of aircraft that will have to be procured under *a new negotiated contract in FY 2016*." *Id.* at 4–5 (emphasis added). In any event, the Army's was not approved by Congress. Pl. Ex. 16, at 3–4.

---

[2] Since this relevant congressional communication was omitted from the Administrative Record, the court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with this public document, which is otherwise subject to Fed. R. Evid. 201(b).

On September 4, 2014, the Army filed a Sources Sought Notice to procure EC-145 aircraft on an Other Than Full and Open Competitive basis "to supplement the Army's existing fleet." AR Tab 20, at 2761. Subsequently, the Army decided not to proceed with the Sources Sought Notice.

On September 19, 2014, AgustaWestland filed a Complaint For Declaratory And Injunctive Relief, in the United States Court of Federal Claims, ECF No. 1, together with: a September 18, 2014 Declaration of Robert LaBelle (ECF No. 1-2); a Motion For A Temporary Restraining Order And Preliminary Injunction, ECF No. 2; a Financial Disclosure Statement Pursuant To [Rule 7.1 of the Rules of the United States Court of Federal Claims ("RCFC")], ECF No. 3; an Uncontested Motion To File Corrected Memorandum Of Points And Authorities, ECF No. 7; and attached a Corrected Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For A Temporary Restraining Order And Preliminary Injunction, ECF No. 7-1.[3] On that same day, the court convened a telephone status conference during which the Government represented that no final decision had been made to proceed with a follow-on sole source procurement for UH-72A Lakota helicopters. On September 22, 2014, the court granted Plaintiff's Uncontested Motion To File Corrected Memorandum Of Points And Authorities. ECF No. 8.

On September 26, 2014, the Government filed a Status Report with the court, stating that the Army's September 4, 2014 Sources Sought Notice indicated that the Army had not made a final decision as to "the competitive process that it will use to procure the aircraft and does not expect to make that decision before the end of January 2015." ECF No. 9, at 1. Since no final decision "with respect to the competitive process to be used" was made, the Government posited that the court did not have jurisdiction over this bid protest, because the claims alleged in the September 19, 2014 Complaint by AgustaWestland were not ripe for review. ECF No. 9, at 2–3.

On October 1, 2014, AgustaWestland filed a Response, urging the court to deny the Government's request to dismiss the bid protest and continue the stay, until the Government issued a final J&A. ECF No. 12, at 5. On October 14, 2014, the court issued an Order denying the Government's request to dismiss Plaintiff's September 19, 2014 Complaint and stayed proceedings, until such time as the Government decided whether to issue a J&A. ECF No. 13, at 1–2.

On October 20, 2014, the Government filed a Status Report with the court to clarify that the Army may exercise options under the 2006 Contract authorizing the Army to purchase an estimated 352–500 UH-72A Lakota helicopters over ten years, including up to 55 UH-72A Lakota helicopters in each program year 2014 and 2015. ECF No. 14, at 3. The Government also advised the court that the Army "may" exercise the 2015 option to purchase 55 helicopters before September 30, 2015. ECF No. 14, at 4.

On January 14, 2015, the Army and Airbus executed Modification P00853 "to establish the negotiated price" for seven UH-72A Mission Equipment Packages ("MEPs"). AR Tab 3zd, at 1590–91.

---

[3] These and all other filings by the parties as well as court orders thereafter were filed under seal.

On February 3, 2015, the Government filed another Status Report with the court stating that "the Army does not expect to make a final decision until August 2015" regarding the procurement of additional UH-72A Lakota helicopters, not subject to the 2006 Contract, and would file another status report at a later date. ECF No. 15, at 3. That same day, the court again stayed proceedings until August 31, 2015 or when the Government's next Status Report was filed, whichever was earlier. ECF No. 16.

On February 12, 2015, the 2006 Contract was modified, allowing the Army to purchase an additional 41 UH-72A Lakota helicopters from Airbus under the 2006 Contract for approximately $220.5 million. AR Tab 3zf, at 1961–63.

On March 25, 2015, the press reported that Airbus had modified seven of the Army's existing UH-72 Lakota helicopters for a training configuration that "differs from the baseline model in several ways . . . [as it] includes an observer seat for the instructor, and has a 'buzz number' on its side that allows for easy identification . . . [and] a flight control system." Pl. Ex. 23, at 2; Pl. Ex. 24, at 2 (reporting that, as of March 25, 2015, "[a]nother roughly 15 UH-72s are being modified for the training role").

On May 1, 2015, the Army and Airbus executed Modification P00878 to add MEPs "to the Lakota Production Aircraft for the Army's [August 2013] Restructure Initiative." AR Tab 3ze, at 1759–60. The new MEPs included a heat blanket; a Wide Area Augmentation System; painted buzz numbers; ballast kit; skid shoes; a Vectoral Mast Moment Indicator; an observer seat; and a Cockpit Voice and Flight Data Recorder. AR Tab 3ze, at 1823.

On August 31, 2015, the Government filed a Status Report to advise the court that the Army's final decision concerning whether to purchase additional UH-72A Lakota helicopters was not expected until November 2015. ECF No. 17, at 1. On September 1, 2015, the court issued an Order, extending the stay until November 30, 2015. ECF No. 18.

On September 3, 2015, the National Commission on the Future of the Army issued a report stating that, "[b]ased on a quick assessment of mission suitability and costs, a review of the decision to employ the UH-72 (LUH) as the Army's primary trainer may be warranted . . . [and observing that other] *[s]uitable and less expensive primary flight trainers are available*." Pl. Ex. 28, at 3 (emphasis added).

On October 9, 2015, Tecolote Research, Inc. completed an Independent Government Estimate ("IGE"), commissioned by the Army, to "[d]etermine the additional costs required to procure and sustain 16 alternate aircraft for the remaining training requirement . . . [including] the additional sustainment cost impact of establishing a mixed training fleet." AR Tab 32, at 2908. AgustaWestland's AW109 was the "dual engine commercially produced aircraft that was used as a representative alternative aircraft to the UH-72A." AR Tab 32, at 2908. The IGE calculated that the procurement and maintenance costs of adding an alternative aircraft to the fleet of UH-72A Lakota helicopters would be approximately $[REDACT] million. AR Tab 32, at 2908. The IGE also concluded that procuring 16 alternate helicopters would entail delays in fulfilling the Army's requirements, adding an estimated minimum of three years to the delivery of these helicopters. AR Tab 32, at 2908.

8

On November 11, 2015, the court issued an Order, staying all pending motions. ECF No. 20. On November 12, 2015, the Army modified the 2006 Contract to order 12 UH-72A Lakota helicopters and MEPs, to be delivered starting in August 2017, at a price of approximately $61 million. AR Tab 3zh, at 2126–27. On November 30, 2015, the Government filed a Status Report stating that the Army expected to issue a J&A sometime in December 2015. ECF No. 21, at 3. On December 2, 2015, the court convened a telephone status conference, wherein the court continued to stay this case, pending a Joint Status Report due on January 5, 2016 or whenever a J&A was filed—whichever was earlier.

On December 10, 2015, the Army issued a J&A to purchase 16 UH-72A Lakota helicopters "on an Other Than Full and Open Competitive basis." AR Tab 33, at 2914–23. The Army concluded that Airbus was uniquely qualified to provide the 16 UH-72A Lakota helicopters required to complete the Army's fleet, because Airbus has exclusive ownership of all the technical data necessary to manufacture the aircraft and related MEPs, and has declined to sell that data. AR Tab 33, at 2915–18. In addition, the "[l]oss of standardization would result in a significant increase in logistics support requirements and training problems associated with operating and maintaining the UH-72[A] [Lakota] aircraft." AR Tab 33, at 2915. The Army also stated that "the estimated duplication of costs that would be incurred in procuring and sustaining an alternative aircraft is significant and is not expected to be recovered in its entirety." AR Tab 33, at 2916.

On December 17, 2015, the parties filed a Joint Status Report with the court confirming that the Army made a final decision to proceed with a sole source procurement of 16 additional UH-72A helicopters; the court lifted the stay. ECF No. 22, at 1–2. On December 28, 2015, Airbus filed an Unopposed Motion To Intervene. ECF No. 23.

On December 29, 2015, the court convened a status conference. Pursuant to that conference, the Government filed a Notice, attaching the December 10, 2015 J&A to purchase 16 UH-72A Lakota helicopters at a price of $[REDACTED],[4] including associated services. ECF No. 29-1.[5] On that date, the court also entered a Protective Order and a second Order, granting Airbus' Unopposed Motion To Intervene. ECF No. 24; ECF No. 28.

On January 6, 2016, the court issued an Order denying AgustaWestland's September 19, 2014 Motion For Temporary Restraining Order And Motion For Preliminary Injunction. ECF No. 33. On January 21, 2016, the court issued a Scheduling Order. ECF No. 41. On January 26, 2016, AgustaWestland filed an Application For Access To Information Under Protective Order By Expert Consultant Or Witness, Rudolph Ostovich, III. ECF No. 43.

On January 28, 2016, the National Commission on the Future of the Army reported that 17 additional UH-72A Lakota helicopters were needed to support training at Fort Rucker, Alabama.

---

[4] According to the Army, the individual unit price of UH-72A Lakota helicopters, including basic fielding pack, manual, tools, and program management is: $[REDACTED]. AR Tab 33, at 2914.

[5] As of December 29, 2015 the Army had purchased 330 UH-72A Lakota helicopters under the 2006 Contract. AR Tab 33, at 2914.

ECF No. 96-1, at A2, A6 (April 22, 2016 Bechtel Memo).[6]  On January 28, 2016, Airbus filed an Objection To AgustaWestland's Application For Access.  ECF No. 44.  On January 29, 2016, AgustaWestland filed a Withdrawal of the January 26, 2016 Application.  ECF No. 45.

On February 1, 2016, AgustaWestland filed a Supplemental Complaint ("Supp. Compl."),[7] including five counts, together with 31 exhibits.  ECF No. 46.  AgustaWestland also filed: a Motion For Preliminary Injunction, ECF No. 47; a Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For A Preliminary Injunction, ECF No. 48, together with: the January 30, 2016 Declaration Of Rudolph Ostovich, III, Major General United States Army (Ret.), ECF No. 49; the February 1, 2016 Supplemental Declaration Of Robert LaBelle, ECF No. 50; and the February 1, 2016 Declaration of Lucas T. Hanback, ECF No. 51.

On February 24, 2016, the Government filed an Unopposed Motion To Amend/Correct The Administrative Record that the court granted to include Tabs 3x, 6 and 6b to the Administrative Record.  ECF No. 59.

On March 8, 2016, AgustaWestland filed: a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR"), ECF No. 61, together with Plaintiff's Exhibits 33, 34a, and 34b, ECF No. 65; the March 8, 2016 Declaration Of Everett P. Harry, ECF No. 62; the March 8, 2016 Declaration Of Neil H. O'Donnell, ECF No. 63; and a Motion For Judicial Notice "of the relevant portions of the testimony of the Honorable John McHugh, Secretary of the Army, given before the Defense Subcommittee on the Senate Committee on Appropriations on April 30, 2014," ECF No. 64, at 1.

As of March 21, 2016, the Army had received 354 UH-72A Lakota helicopters, with an additional 58 that still could be ordered under the 2006 Contract.  ECF No. 71-1, at 2.

On March 29, 2016, the Government filed: a Motion To Strike the Declaration Of Rudolph Ostovich, III (ECF No. 49); the Declaration and Supplemental Declaration Of Robert LaBelle (ECF No. 1-2; ECF No. 50); the Declaration Of Everett P. Harry (ECF No. 62); and an Appendix to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 65).  ECF No. 68.[8]  In

---

[6] Peter B. Bechtel is the Director, Capabilities Integration, Prioritization and Analysis for the Army.  ECF No. 96-1, at A7.

[7] RCFC 15(d) provides, "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  RCFC 15(d).  The February 1, 2016 Supplemental Complaint alleged that Army's actions taken after the September 19, 2014 Complaint was filed were unlawful.  Supp. Compl. ¶¶ 45–55.

[8] The court grants the Government's March 29, 2016 Motion To Strike (ECF No. 68), in part, because AgustaWestland's proffered Declarations (ECF Nos. 1-2, 49, 50, 62), were not considered by the Army in issuing the December 10, 2015 J&A.  But, the court declines to supplement the Administrative Record with the January 28, 2016 Declaration of John Burke (ECF No. 44-1), since it appears to be a rebuttal to the Ostovich Declaration, which the court also declined to add as a Supplement to the Administrative Record.  This ruling also applies to the

addition, on March 29, 2016, the Government filed a Motion To Amend/Correct the February 17, 2016 Sealed Administrative Record by including: the July 26, 2005 Solicitation for Contract No. W58RGZ-06-C-0194 (AR Tab 34); AgustaWestland's final technical proposal (AR Tab at 35); and Airbus' final technical proposal (AR Tab 36), and eight Determination and Findings Memos made prior to exercising options on the 2006 Contract (AR Tabs 37–44). ECF No. 69.[9] And, on March 29, 2016, the Government filed a Motion To Dismiss, In Part ("Gov't Mot. To Dis."), And Opposition To Plaintiff's Motion For Judgment On The Administrative Record ("Gov't Opp."), And A Cross-Motion For Judgment On The Administrative Record ("Gov't Cross Mot."), ECF No. 71. The Government also proffered a March 29, 2016 Declaration of David R. Cheney II, Lieutenant Colonel, United States Army. ECF No. 71-1.[10]

On March 29, 2016, Airbus filed: a Cross-Motion For Judgment On The Administrative Record And Response To Plaintiff's Motion For Judgment On The Administrative Record (ECF No. 70); a Motion To Supplement The Administrative Record, (ECF No. 72); and a Motion For Judicial Notice (ECF No. 72),[11] including excerpts from: the 2006 Solicitation; Airbus' Final Technical Proposal in response to the 2006 Solicitation; an excerpt from the FY 2015 Hearing on the National Defense Authorization Act; the 2015 Independent Cost Analysis of the Army Aviation Restructure Initiative; a 2015 GAO Analysis of Aviation Alternatives; Minutes from the September 2, 2015 National Commission on Future of the Army Meeting; an OMB Circular; and several news articles.

_____

March 28, 2016 First Supplemental Declaration of John Burke (ECF No. 70-2, at 68–81). The court also denies the Government's Motion to Strike the May 16, 2014 letter to the Under Secretary of Defense (ECF No. 50, at 8–9), attached to the February 1, 2016 Supplemental Declaration of Robert LaBelle (ECF No. 50).

[9] The court denies the Government's March 29, 2016 Motion To Amend/Correct (ECF No. 69), in part, because AR Tabs 35–44 are not relevant to this bid protest. The court admits AR Tab 34.

[10] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with the March 29, 2016 Cheney Declaration (ECF No. 71-1), as it discusses the current rate of deliveries of the UH-72A Lakota helicopters and the effects of a permanent injunction.

[11] The court grants Airbus' Motion For Judicial Notice as to Exhibit D (ECF No. 70-1, at 19–27); Exhibit E (ECF No. 70-2, at 1–6); Exhibit F (ECF No. 70-2, at 7–25); Exhibit G (ECF No. 70-2, at 26–36); Exhibit J (ECF No. 70-2, at 82–92); Exhibit K (ECF No. 70-2, at 93–97); Exhibit L (ECF No. 70-2, at 98–101); and Exhibit M (ECF No. 70-2, at 102–04). The court declines to supplement the Administrative Record with the March 26, 2016 Declaration of Mr. William B. Stedman (ECF No. 70-1, at 37–68) since it was submitted to rebut the Declaration of Robert LaBelle, Major General (Ret.) Rudolph Ostovich, III, and Everett P. Harry, neither of which were admitted by the court to supplement the Administrative Record.

On April 8, 2016, AgustaWestland filed a Reply And Response To Defendant's Motion To Dismiss And Defendant And Defendant-Intervenor's Cross-Motions For Judgment On The Administrative Record. ECF No. 79. That same day, AgustaWestland also filed: the April 8, 2016 Supplemental Declaration Of Everett P. Harry, ECF No. 80;[12] a Response To Motion To Strike And Motion To Supplement Record, ECF No. 81; and a Second Motion For Judicial Notice of RICHARD A. BREALEY, ET AL., PRINCIPLES OF CORPORATE FINANCE (10th ed. 2010) and the current United States debt, as announced by the Department of Treasury. ECF No. 82, at 2.[13] On April 12, 2016, AgustaWestland filed a Motion To Redact Plaintiff's Reply And Response To Defendant's Motion To Dismiss And Defendant's And Defendant-Intervenor's Cross-Motions For Judgment On The Administrative Record. ECF No. 83. On April 13, 2016, the court convened a telephone status conference. That same day, AgustaWestland filed an "Application To Identify Additional Authority." ECF No. 86. On April 14, 2016, the court granted AgustaWestland's March 8, 2016 Motion For Judicial Notice concerning the testimony of the Honorable John McHugh, Secretary of the Army, before the Defense Subcommittee on the Senate Committee on Appropriations on April 30, 2014 and denied, in part, the Government's March 29, 2016 Motion To Strike with respect to admitting Exhibits 34a and 34b. ECF No. 87.

On April 18, 2016, the Government filed a Reply In Support Of Its Motion To Dismiss, In Part, ("Gov't Reply") And Cross-Motion For Judgment On The Administrative Record ("Gov't CM"). ECF No. 89. Airbus also filed a Reply To Plaintiff's Response To Defendant-Intervenor's Cross-Motion For Judgment On The Administrative Record. ECF No. 90. On April 26, 2016, AgustaWestland filed a Second Motion To Strike the Supplemental Declaration of William B. Stedman, filed by Airbus on April 14, 2016. ECF No. 93.[14]

On May 6, 2016, the Government filed a Motion For Leave To File Status Report And Appendix. ECF No. 96. In the May 6, 2016 Motion, the Government advised the court that, in addition to the 16 UH-72A Lakota helicopters identified in the December 10, 2015 J&A needed for training purposes (AR Tab 33, at 2912–13), the Army has determined that an additional 17 UH-72A Lakota helicopters are needed to support training at Fort Rucker, Alabama, an additional 18 UH-72A Lakota helicopters are needed to replace UH-1 and OH-58 A/C helicopters, and 62 UH-72A Lakota helicopters are needed to replace UH-60A helicopters. ECF No. 96, at 3. The Army, however, has not decided when or under what procurement vehicle it will acquire these 97 additional UH-72A Lakota helicopters. ECF No. 96, at 3. The Army estimated that, even if the funding is secured and the acquisition of these 97 additional UH-72A Lakota helicopters is approved, "the[] procurement steps leading to the award of any contract will take an estimated 30 to 36 months to complete." ECF No. 96, at 3. On May 9, 2016, AgustaWestland filed a Request

---

[12] The court declines to supplement the Administrative Record with the Supplemental Declaration Of Everett P. Harry (ECF No. 80), as it was not considered by the Army in issuing the December 10, 2015 J&A.

[13] AgustaWestland's Second Motion for Judicial Notice (ECF No. 82) is denied, as it is not relevant to this bid protest.

[14] The court grants AgustaWestland's Second Motion to Strike the Declaration Of Mr. Stedman, as it was not considered by the Army in issuing the December 10, 2015 J&A.

To Respond to the Government's May 6, 2016 Status Report. ECF No. 97. On May 13, 2016, the court issued an Order granting the Government's May 6, 2016 Motion and AgustaWestland's May 9, 2016 Request and convened a status conference to schedule an Oral Argument to be held at the National Courts Building in Washington, D.C. on June 9, 2016 at 10:00am EST. ECF No. 99. On May 13, 2016, the Government filed a Response to AgustaWestland's Second Motion To Strike. ECF No. 100. On May 31, 2016, AgustaWestland filed a Response to the Government's May 6, 2016 Status Report. ECF No. 103.

On June 9, 2016, the court held Oral Argument ("6/9/16 TR 1–100"). That same day, the court issued an Order, requiring the Government to:

1. [p]roduce an affidavit from Shelley Muhammad, the Special Competitive Advocate, attesting to the precise date that he/she reviewed the December 10, 2015 J&A and whether he/she concurred with the contents, together with any documents reflecting his/her analysis of the December 10, 2015 Justification Review Document For Other Than Full And Open Competition.

2. [p]roduce a copy of all information referred to in the Market Research Section of AR2806–07 and Section 8 Market Research on AR2918–19.

3. [p]roduce a copy of all correspondence between the Army and Airbus in the fall of 2013 and June 2014 concerning or relating to Airbus's refusal to sell or lease Airbus's Technical Data Package ("TDP") for the UH-72 to the Army.

4. [p]roduce a copy of the Subcontracting Plan referred to in 10(c) at AR 2921.

5. [p]roduce the underlying data and materials used in the Independent Government Estimate[.]

ECF No. 105, at 1–2.

In addition, the court directed Airbus "to supplement the Administrative Record as follows: all internal Airbus documents regarding the refusal to sell its TDP for the UH-72 to the Army." ECF No. 105.[15] On June 13, 2016, Airbus filed a Motion For Reconsideration of the court's June 9, 2016 Order. ECF No. 107.[16] On June 15, 2016, the court held a telephone status conference with the parties.

---

[15] Airbus' submission was requested, because during the June 9, 2016 Oral Argument, neither Airbus' counsel nor the Government's counsel was able to inform the court what Airbus' "Technical Data Package" included or whether the Army had access to it, as required by the 2006 Contract. 6/9/16 TR, at 6–9, 31–32, 61–62, 65–67. All of the court's e-mail requests for information are on file in the Case Management/Electronic Case Files System. ECF No. 120-1; ECF No. 123-1; ECF No. 124-1.

[16] The court denies Airbus' June 13, 2016 Motion For Reconsideration as moot.

On June 21, 2016, the Government filed a Notice Of Compliance With The Court's June 9, 2016 Order, wherein the court was informed that the Army voluntarily would stay award of a contract with Airbus, pursuant to the December 10, 2015 J&A, until July 31, 2016. ECF No. 112, at 6. In addition, the Government provided an affidavit from Shelley R. Muhammad, the SCA, stating that June 29, 2015 was the date he signed the December 10, 2015 J&A. AR Tab 45.[17] On June 22, 2016, Airbus provided the court with "further information" about the "Technical Data Package" associated with the UH-72A Lakota helicopters. ECF No. 114.

On June 22 and 23, 2016, the court sent a follow-up inquiry by e-mail to the parties, requesting: (1) the identity of the author of AR 5076; (2) an explanation of the large blank space on AR 5076; and (3) an explanation of how the price listed for the "[c]urrent ROM [Rough Order Magnitude] for a[n] upgraded CPT [Cockpit Procedural Training] from Airbus" was calculated. ECF No. 120-1, at 2.

On July 1, 2016, the Government filed a Notice Of Filing Response To The Court's Questions Of June 22 & 23, 2016, together with the June 30, 2016 Declaration of Gregory W. Segraves, a Technical Manager at Tecolote Research Inc., ("Segraves Decl."). ECF No. 116; 116-1.

On July 12, 2016, the court sent another follow-up inquiry by e-mail to the parties, requesting the original ARI and asked whether the Army designated the UH-72A Lakota helicopter as the Army's "Institutional Training Helicopter" beyond the 10 year term of the 2006 Contract. ECF No. 120-1, at 3. The court also asked the Government to reconsider denying the court's request to review the underlying documents and analysis of the Competition Advocate. ECF No. 120-1, at 3.

On July 22, 2016, the Government filed a Notice Of Filing Response To The Court's Questions Of July 12, 2016 (ECF No. 119) and attached the July 22, 2016 Declaration of Stephen O. Murphy, Lieutenant Colonel, United States Army. ECF. No. 119-1.[18] The Government also agreed not to proceed with the procurement until August 18, 2016. ECF No. 119, at 7. In addition, the Government filed a Supplement To The Administrative Record with Tabs 69A–F and 70. That same day, the court sent an e-mail to the parties, asking:

1. At AR 5201, the estimated costs to transition to UH-72AS is $[REDACTED] million. How was this amount determined; by whom; what does it cover.

2. Savings of $[REDACTED] million is listed as "UH-72A OPTEMPO offset". How was this amount determined; by whom; what does it cover.

---

[17] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with the June 30, 2016 Muhammad affidavit, as it provides the date and verified that he reviewed the December 10, 2015 J&A.

[18] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with the July 22, 2016 Murphy Declaration that evidences that the policy decision of the ARI was implemented as a procurement decision by Executive Order 109-14.

3. AR 5202 appears to represent that, as of the Sept 27, 2013 briefing, 317 UH-72As were purchased. Is this correct.

4. AR 5279 at the second block shows UH 72s with headings and text that are unintelligible, even with my magnifying glass. What are the headings, text and numbers, and what is being represented.

ECF No. 123-1, at 1.

On July 27, 2016, the Government advised that a response to the court's July 22, 2016 inquiries would be filed by August 5, 2016. ECF No. 124-1, at 2. On August 4, 2016, the Government informed the court that a response would not be forthcoming until August 12, 2016 and extended the voluntary stay until and including September 8, 2016. ECF No. 124-1, at 1. On August 11, 2016, the Government filed a Notice Of Filing Response To The Court's Questions Of July 12, 2016, ECF No. 125, and attached thereto the August 10, 2016 Declaration of Ellis Golson, Deputy Director, Aviation Capability Development and Integration, ECF No. 125-1.

## II. DISCUSSION.

### A. Standard Of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), Congress authorized the United States Court of Federal Claims to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Supp., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

As the United States Court of Appeals for the Federal Circuit has held, the court's primary responsibility is to determine whether the agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial. *See Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (internal quotation marks and citations omitted); *see also Banknote Corp.*, 365 F.3d at 1351 (holding, when challenging a government contract procurement due to a violation of law or procedure, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (citations omitted).

If no prejudicial violation of law or regulation is found, the court next is required to determine whether the agency decision evidences a rational basis. *See Savantage Fin. Servs. Inc. v. United States*, 595 F.3d. 1282, 1286 (Fed. Cir. 2010) (holding that a court "must sustain an

15

agency action unless the action does not evidence rational reasoning and consideration of relevant factors") (quotations omitted); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (holding that to meet the burden of showing that a sole-source award lacks rational basis, the plaintiff must show: "(1) the agency's decision to conduct a sole-source procurement process lacked a rational basis; (2) the agency's sole-source requirements lacked a rational basis; *or* (3) based on the sole-source requirements, the selection of the sole-source awardee lacked a rational basis") (emphasis added).

Finally, the court is required to ascertain whether a federal agency *otherwise* acted in an arbitrary and capricious manner with respect to the procurement at issue. *See Banknote Corp.*, 365 F.3d at 1350 ("[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion.'"). Courts have found an agency's decision to be arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In this case, the parties filed Cross-Motions For Judgment On The Administrative Record that require the court to conduct a proceeding like an expedited trial on the record. *See* RCFC 52.1; *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("[T]he judgment on an [A]dministrative [R]ecord is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, even if the court has not conducted an evidentiary proceeding. *Id.* at 1354 (holding that the court should make "factual findings from the record evidence as if it were conducting a trial on the record").

## B.   Analysis And Rulings On AgustaWestland's February 1, 2016 Supplemental Complaint.

### 1.   Count I.

Count I of the Supplemental Complaint appears to allege that the Army's July 2014 announced intent to procure 110 UH-72A Lakota helicopters under the 2006 Contract violated the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304(a), and FAR 6.3, that mandate full and open competition. Supp. Compl. ¶¶ 89–93. This count also appears to set forth two claims. The first concerns the Army's purchase of 110 UH-72A Lakota helicopters, pursuant to the 2006 Contract options. Supp. Compl. ¶ 90. The second concerns the Army's decision to use the 2006 Contract to purchase UH-72A Lakotas for "initial pilot training helicopters." Supp. Compl. ¶¶ 90–93.

Count I, however, fails to mention that AgustaWestland filed a bid protest in 2006 before the GAO that was denied. *See MD Helicopters, Inc.; AgustaWestland, Inc.* B-298502, et al., 2006 CPD ¶ 164 (Comp. Gen. Oct. 23, 2006). Therefore, any challenge to the 2006 Contract is now barred by the Tucker Act's six year statute of limitations. *See* 28 U.S.C. § 2501 ("*Every* claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.") (emphasis added). Therefore, AgustaWestland is foreclosed from challenging any Army actions under the 2006 Contract, eight

years after it was awarded. Assuming *arguendo*, that jurisdiction is not an issue, the 2005 SOW[19] and the 2006 Solicitation[20] explicitly lists "training support" as a potential mission of the UH-72A Lakota helicopter. Therefore, the Army's purchase of the UH-72A Lakota helicopters and subsequent use for training did not expand nor exceed either the 2005 SOW or the 2006 Solicitation and did not violate FAR 6.3.[21] *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1207 (Fed. Cir. 1993) ("An important factor in determining the scope of the original competition is 'whether the [S]olicitation for the original contract adequately advised offerors of the potential or the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated.'" (quoting *Neil R. Gross & Co.*, 90–1 CPD ¶ 212 at 3 (1990))); *see also Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008) ("[A]dding work to a contract that is clearly within the scope of the contract does not raise a viable protest under [28 U.S.C.] § 1491(b)(1)."); 27 No. 3 VERNON J. EDWARDS, NASH & CIBINIC REPORT, SCOPE OF THE COMPETITION TEST: IS IT VALID? ¶ 12 (2013) ("CICA . . . does not prevent modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement.").

Nor did the Army's decision to purchase UH-72A Lakota helicopters for training under the option provisions of the 2006 Contract reflect a "cardinal change," as AgustaWestland argued, but failed to allege in the Supplemental Complaint. *Compare* Pl. Mot. JAR at 6–13, *with* Supp. Compl. ¶¶ 88–117. With respect to the extension of the options, extension of the delivery date, accelerated milestone payment schedules, and training MEPs, none of these modifications exceeded the 2005 SOW, the 2006 Solicitation, or the 2006 Contract. *See* 1 WILLISTON ON CONTRACTS § 5:18 (4th ed. 2011) ("When the optionee decides to exercise its option, it must act unconditionally and according to the terms of the option, and as soon as the acceptance is so made, the optionor becomes bound. Nothing less than an unconditional and precise acceptance will suffice *unless the optionor waives one or more of the terms of the option*.") (emphasis added). The Administrative Record evidences an "unconditional and precise acceptance" of the modifications by the Army and Airbus and neither waived any of the option terms. AR Tabs 3a–3zh.

---

[19] The June 22, 2005 SOW specified that among the "missions" that the LUHs would perform included: *"test and training support."* AR Tab 3, at 285 (emphasis added).

[20] The 2006 Solicitation stated that the LUHs would be used for *"test and training support."* AR Tab 34, at 3232 (emphasis added).

[21] Although AgustaWestland failed to provide a specific citation within FAR 6.3, the court interprets AgustaWestland to refer to FAR 6.301(a) that provides, "Contracting without providing for full and open competition or full and open competition after exclusion of sources is a violation of statute, unless permitted by one of the exceptions in 6.302." 48 C.F.R. § 6.301(a).

For these reasons, the court has determined that the claims alleged in Count I of the Supplemental Complaint must be dismissed. *See* RCFC 8(d)(1);[22] 12(b)(1); 12(b)(6).

### 2.    Count II.

Count II of the Supplemental Complaint alleges that an August 13, 2013 briefing of the Army's Chief of Staff and apparent approval of an October 2013 ARI, designating the UH-72A Lakota helicopter as the Army's "Institutional Training Helicopter" (AR Tab 69A, at 5156) violates the CICA, 10 U.S.C. § 2304(f)[23] and the FAR 6.303, 6.304, and 6.305. Supp. Compl. ¶¶ 94–96.

The Government argues that the court does not have jurisdiction to adjudicate Count II of the Supplemental Complaint, because the ARI was a "policy decision regarding the use and deployment of its aviation assets" and that decision did not amount to a "procurement" or "proposed procurement" under the Tucker Act or the CICA. Gov't Mot. To Dis. at 18. The July 22, 2016 Declaration of U.S. Army Lieutenant Colonel Stephen O. Murphy, proffered by the Government after the Supplemental Complaint was filed, however, informed the court that, on April 3, 2014, the Army issued Executive Order 109-14 which, in part, directed that "the [Army's] Institutional Training Helicopter fleet is converted to UH-72As and the legacy TH-67 training helicopter is divested." *Compare* ECF No. 119-1, at 2 (7/22/16 Murphy Decl.), *with* AR Tab 69A, at 5156. The effect of the April 3, 2014 Executive Order embodied the Army's decision to standardize on the UH-72A Lakota helicopter, as the "only one responsible source," for all future

---

[22] The court also found the allegations in Count I of the Supplemental Complaint to be far from "simple, concise, and direct." RCFC 8(d)(1). Submitting ambiguous pleadings—later "filling in the blanks" in briefs or argument—is a transparent and unwelcome litigation tactic.

[23] Section 2304(f) of the CICA, in relevant part, provides:

(f)(1) Except as provided in paragraph (2), the head of an agency may not award a contract using procedures other than competitive procedures unless—

    (A) the contracting officer for the contract justifies the use of such procedures in writing and certifies the accuracy and completeness of the justification;

    (B) the justification is approved . . . (iii) in the case of a contract for an amount exceeding $75,000,000, by the senior procurement executive of the agency designated pursuant to section 1702(c) of title 41 (without further delegation) or in the case of the Under Secretary of Defense for Acquisition, Technology, and Logistics, acting in this capacity as the senior procurement executive for the Department of Defense, the Under Secretary's delegate designated pursuant to paragraph (6)(B); and

    (C) any required notice has been published with respect to such contract pursuant to section 1708 of title 41 and all bids or proposals received in response to that notice have been considered by the head of the agency.

10 U.S.C. § 2304(f).

LUH training helicopter procurements. *See* FAR 6.302-1. As such, the April 3, 2014 Executive Order 109-14 was a quintessential procurement decision, as it determined "a need for property or services." *Distributed Sols.*, 539 F.3d at 1345 (quoting 41 U.S.C. § 403(2) (codified as amended at 41 U.S.C. § 111)). Of course, the court does not have jurisdiction to adjudicate the Army's policy decision that it needs training helicopters or the number of helicopters required, but the court has jurisdiction to adjudicate whether the Army's April 3, 2014 Executive Order 109-14, to the extent that it standardized on the UH-72A Lakota helicopter as the "only one responsible source" for all future LUH training helicopter purchases, violated the CICA and the FAR. *See RAMCOR Servs. Group, Inc.*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction [to the United States Court of Federal Claims].").

A plaintiff contesting an award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "'interested party' in section 1491(b)(1) . . . in accordance with [CICA], 31 U.S.C. §§ 3551–56." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Therefore, "to come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Id.* In addition to establishing "interested party" status, a protestor must show that the alleged errors in the procurement were prejudicial. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Specifically, when challenging a sole source award, "a disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award[;] or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award[.]" *Emery Worldwide Airlines*, 264 F.3d at 1086 (citations omitted).

AgustaWestland's economic interest in the procurement of the 16 helicopters at issue in this bid protest is established. ECF No. 50, at 8–9 (5/16/14 Letter From Robert LaBelle, CEO of AgustaWestland North America to The Honorable Frank Kendall, Under Secretary of Defense). And, after the 2006 Contract expired on June 30, 2016, AgustaWestland would have had a substantial chance of being awarded a contract for the Army's additional requirements for LUH training helicopters, but for the April 3, 2014 Executive Order 109-14's standardization and sole source directive. As such, AgustaWestland has standing to request an adjudication of the claims alleged in Count II, particularly since neither the court nor AgustaWestland knew about the existence of the April 3, 2014 Executive Order 109-14, until the court received the July 22, 2016 Murphy Declaration. ECF No. 119-1.

To the extent that the April 3, 2014 Executive Order 109-14 intended to satisfy the requirement of a justification review for other than full and open competition, several deficiencies

are apparent. First, the April 3, 2014 Executive Order 109-14 does not identify the "statutory authority permitting other than full and open competition." 48 C.F.R. § 6.303-2(b)(4).[24] Second, the April 3, 2014 Executive Order 109-14 failed to include a determination that, "the anticipated cost to the Government" of standardizing on the UH-72A Lakota helicopter or that the cost could be "fair and reasonable." 48 C.F.R. § 6.303-2(b)(7).[25] To be sure, standardization can result in efficiencies, particularly for purposes of interchangeable replacement parts and service. But, the relevant inquiry is at what cost? *See* Luis Garicano & Richard A. Posner, *Intelligence Failures: An Organizational Economics Perspective*, 19 J. ECON. PERSPS. 151, 158 (2005) ("Unfortunately, an organizational culture that is optimal in the current environment may become suboptimal when the environment changes, and yet agents will be rationally reluctant to change the design . . . . Once information channels and other organizing elements are created, a sunk investment has been made that will constrain the organization's reaction to a new environment[.]"). After a thorough review of the ARI and Appendices, the October 24, 2013 Briefing before the Chief of Staff of the Army, and the April 3, 2014 Executive Order 109-14, the court found no acknowledgement of the Army's legal obligation to issue a J&A to support its decision that "the Institutional Training Helicopter fleet is converted to UH-72s" without "full and open competition," as required by FAR 6.303-1.[26] AR Tab 69A, at 5154–5280; ECF No. 119-1. Although Congress was advised that the Army intended to proceed with the ARI, which the Executive Order 109-14 implemented, Congress was never informed that the Army intended to purchase the UH-72A Lakota helicopters, without "full and open competition," nor did that authorization repeal the CICA nor modify it in any way. ECF No. 12-2, at 2.

For these reasons, individually and collectively, the court has determined that the April 3, 2014 Executive Order 109-14, to the extent that it standardized on the UH-72A Lakota helicopters as the Army's "only one responsible source" for Institutional Training Helicopters, violated the CICA and above referenced FAR sections.

---

[24] FAR 6.303-2(b)(4) provides, "As a minimum, each justification, except those for sole-source 8(a) contracts over $22 million . . . shall include . . . (4) [a]n identification of the statutory authority permitting other than full and open competition." 48 C.F.R. § 6.303-2(b)(4).

[25] FAR 6.302-2(b)(7) requires, "[a] determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable." 48 C.F.R. § 6.302-2(b)(7).

[26] FAR 6.303-1(a) states:

> (a) A contracting officer shall not commence negotiations for a sole source contract, commence negotiations for a contract resulting from an unsolicited proposal, or award any other contract without providing for full and open competition unless the contracting officer—
>
> (1) Justifies, if required in 6.302, the use of such actions in writing;
> (2) Certifies the accuracy and completeness of the justification; and
> (3) Obtains the approval required by 6.304.

48 C.F.R. § 6.303-1(a).

### 3.    Count III.

Count III of the Supplemental Complaint alleges that the Army's decision to purchase the 16 helicopters, at issue, pursuant to the December 10, 2015 J&A, does not comply with the CICA and FAR 6.3. Supp. Compl. ¶¶ 98–99. The Supplemental Complaint also alleges that the Army "has not provided any proper justification for using other than full and open competition or demonstrated that any of the available exemptions to full and open competition apply." Supp. Compl. ¶ 100. Specifically, the "only one responsible source" exception, recognized at 10 U.S.C. § 2304(c)(1) and FAR 6.302-1(a)(2)(ii) is inapplicable, because AgustaWestland can provide training helicopters that meet the Army's requirements. Supp. Compl. ¶ 101. In addition, "there are many alternative sources that can meet the Army's initial pilot training requirements." Supp. Comp. ¶ 102. Therefore, the December 10, 2015 J&A cannot represent that there are "no other supplies or services [that] will satisfy [the Army's] requirements." Supp. Compl. ¶ 102.

Since the court's jurisdiction to adjudicate the claims alleged in Count III and AgustaWestland's standing have been discussed and resolved in Count II, but for Paragraph 102 of the Supplemental Complaint,[27] the court will proceed to determine whether the Army's December 10, 2015 J&A complied with the CICA and applicable FAR regulations.

The December 10, 2015 J&A cites 10 U.S.C. § 2304(c)(1), as implemented by FAR 6.302-1(a)(2)(ii)–(iii), as authority for proceeding with an other than full and open competition. AR Tab 33, at 2914. These FAR provisions permit the Department of Defense ("DoD") to procure requirements on a sole source basis, when:

(ii) Supplies may be deemed to be available only from the original source *in the case of a follow-on contract* for the continued development or production of a *major system*[28] *or highly specialized equipment*, including major components thereof,

---

[27] The Supplemental Complaint alleges "to the extent these 16 aircraft are to be used for general service missions for the Air National Guard, the Army could meet these needs with the UH-72As that have been in the inventory of the regular Army and that the Army has announced will be transferred to Ft. Rucker." Supp. Compl. ¶ 102. AgustaWestland, however, does not have standing to challenge logistical decisions of the Army nor does the court have jurisdiction to adjudicate this type of claim. Therefore, Paragraph 102 of the Supplemental Complaint must be dismissed.

[28] A system is a *major system* if—

The Department of Defense is responsible for the system and the total expenditures for research, development, test, and evaluation for the system are estimated to be more than $185 million based on Fiscal Year 2014 constant dollars or the eventual total expenditure for the acquisition exceeds $835 million based on Fiscal Year 2014 constant dollars (or any update of these thresholds based on a more recent fiscal year, as specified in the DoD Instruction 5000.02, "Operation of the Defense Acquisition System");

* * *

when it is likely that award to any other source would result in (A) substantial duplication of cost to the Government that is not expected to be recovered through competition, or (B) unacceptable delays in fulfilling the agency's requirements.

(iii) For DoD, . . . services may be deemed to be available only from the original source in the case of *follow-on contracts* for the continued provision of *highly specialized services* when it is likely that award to any other source would result in (A) substantial duplication of cost to the Government that is not expected to be recovered through competition, or (B) unacceptable delays in fulfilling the agency's requirements.

FAR 6.302-1(a)(2)(ii)–(iii) (emphasis added) (citations omitted).

The December 10, 2015 J&A, however, does not state at any place that the proposed procurement of the 16 UH-72A Lakota helicopters at issue is a "follow-on contract" of a "major system" or of "highly specialized equipment." AR Tab 33. Instead, the December 10, 2015 J&A states that this is a "new contract." AR Tab 33, at 2914;[29] *see also* DoD 2014 Reprogramming Request representing to Congress that the FY16 purchase of UH-72A Lakota helicopters would be under a "*new negotiated contract*") (emphasis added). Therefore, the statutory and regulatory basis for the December 10, 2015 J&A, at a minimum, was misstated. *See* FAR 6.303-2(b)(4).

The December 10, 2015 J&A also states that a principal reason for the Army not procuring the 16 helicopters, at issue, via "full and open competition" is that Airbus "is the sole owner of the exclusive technical data necessary to manufacture the [UH-72A Lakota helicopter] and aircraft modifications necessary for the Army's UH-72 fleet." AR Tab 33, at 2915. In addition, "[a]s the OEM [Original Equipment Manufacturer], [Airbus] has exclusive ownership of all data rights required to produce, maintain, and modify the UH-72[.]" AR Tab 33, at 2915. But, Airbus does not have exclusive ownership of its Technical Data Package, *because* it is the OEM of the UH-72A Lakota helicopter, *but because Airbus will not license or sell its Technical Data Package to anyone, including the Army.* AR Tab 33, at 2917. That is Airbus' legal right. Nor does the Army have *any basis* for representing that Airbus "possesses the unique data, designs, special tooling, equipment, and processes necessary to certify the UH-72 to FAA standards, which is essential to

---

(3) The system is designated a "major system" by the head of the agency responsible for the system (10 U.S.C. 2302 and 41 U.S.C. 109).

48 C.F.R. § 2.101 (emphasis added).

[29] Recognizing this fatal flaw in the December 10, 2015 J&A, the Government repeatedly misrepresented in its Reply Brief that the December 10, 2015 J&A concerned a "follow-on contract," instead of a "new contract," apparently thinking if it used the term "follow-on contract" enough, it would magically change the fact that the December 10, 2015 J&A describes this as a "new contract." Gov't Reply at 2, 4, 9, 36, 38, 40–42. *Cf. Coast Prof'l, Inc. v. United States, Fin. Mgmt. Sys., Inc.*, Nos. 2015-5077, 2015-5101, 2016 WL 3734671, at *4 (Fed. Cir. July 12, 2016) (holding that "[e]ven when a new Task Order contracts for the same work previously performed by the same contractor, . . . this new Task Order is the award of a new contract").

meeting the Government's requirement" (AR Tab 33, at 2915), since Airbus considers that its Technical Data Package, including data designs, is a trade secret, proprietary, and/or confidential information of which *no one*, other than Airbus, has total knowledge—and certainly not the Army. ECF No. 114.

More importantly, the Army's apparent lack of diligence and/or acquiescence to Airbus' policy of not selling or licensing its Technical Data Package in 2006 does not provide a justification for exempting a *new* procurement to full and open competition in 2016 and without considering the potential increased cost that Airbus can charge for its intellectual property. As the Federal Trade Commission has observed:

[T]he owner of a patented technology [or other intellectual property] necessary to implement [a standard] *may* have the power to extract higher royalties or other licensing terms that reflect the absence of competitive alternatives. . . . Consumers of the products using the standard would be harmed to the extent those higher royalties were passed on in the form of higher prices.

2010 Submission of the United States to Working Party No. 2 on Competition and Regulation, DAF/COMP/WP2/WD(2010)28, *available at* http://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/usstandardsetting.pdf (emphasis added). The IGE, however, did not consider whether Airbus extracted or could extract a supra competitive price on its UH-72A Lakota helicopters, because of the Technical Data Package.

In addition, the December 10, 2015 J&A represents that Airbus is "the only contractor that can maintain standardization of hardware across the various UH-72[A Lakota helicopter] configurations in the Army's fleet [and, l]oss of standardization would result in a significant increase in logistics support requirements and training problems associated with operating and maintaining the UH-72 aircraft." AR Tab 33, at 2915. This is true, because the Army made a decision in 2006 to procure UH-72A Lakota helicopters under the 2006 Contract that "locked in" the Army to Airbus' Technical Data Package for the life of the UH-72A Lakota helicopter, *i.e.*, *until at least 2035 or 2041. Compare* Pl. Ex. 7, at 3 (Annual Aviation Inventory and Funding Plan – Fiscal Years (FY) 2014–2043) ("UH-72: This is the newest fleet and will complete procurement in FY14. This capability will be sustained through FY35."),[30] *with* 6/9/16 TR at 37 (GOVERNMENT COUNSEL: "Yes, Your Honor. [Until 2041] is the typical life span of these helicopter systems."). The Army's 2006 decision to disregard the sunk or embedded costs of entering into a contract that did not authorize the purchase or lease of Airbus' Technical Data Package is not at issue at this juncture. But, FAR 6.302-1(b)(2) provides that "the mere existence of [property] rights or circumstances *does not in and of itself* justify the use of" the "only one responsible source"

---

[30] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with this public document, that otherwise is subject to Rule 201(b) of the Federal Rules of Evidence ("Fed. R. Evid."), as it establishes the long life span of the UH-72A Lakota helicopter, which is otherwise not discussed in the Administrative Record.

exception to "full and open competition."  48 C.F.R. § 6.302-1(b)(2) (emphasis added).[31] Therefore, Airbus' decision not to sell or license its Technical Data Package to the Army for the past decade is not a sufficient reason to justify this "new contract" as a sole source procurement.

The second major reason cited in the December 10, 2015 J&A for a non-competitive procurement is that the

> estimated duplication of costs . . . in procuring and sustaining an alternative aircraft is significant and is not expected to be recovered in its entirety. The estimated total costs are $[REDACTED] million and were determined via an [IGE][32] . . . derived by considering the costs of conducting the source selection, *increased* procurement costs of an alternative aircraft, the impact to sustaining another aircraft separate from the Lakota . . . , as well as a recoup program of the TH-67 training aircraft to ensure their availability through fielding of a new aircraft.

AR Tab 33, at 2916 (emphasis added). In the court's judgment, the IGE's estimate of the costs of this proposed procurement is neither independent nor reliable.

Specifically, the IGE began its analysis representing that the "Scope of Work" was to: "Determine the *additional costs* required to procure and sustain 16 alternate aircraft for the remaining training requirement[,] [i]nclud[ing] the *additional sustainment cost impact* of establishing a mixed training fleet." AR Tab 32, at 2908 (emphasis added). Instead of the "Scope of Work" being framed to determine *whether* there would be additional costs and the amount, the IGE simply assumed—or was instructed by the Army—to assume that there would be "additional costs," with respect to purchasing these 16 helicopters, at issue, and having a "mixed" training fleet. AR Tab 32, at 2908. The fact that the Scope of Work assumed the conclusion that the Army needed to substantiate the December 10, 2015 J&A, without full and open competition, is not a

---

[31] FAR 6.302-1(b)(2) provides

> The existence of limited rights in data, patent rights, copyrights, or secret processes; the control of basic raw material; or similar circumstances, make the supplies and services available from only one source (however, the mere existence of such rights or circumstances does not in and of itself justify the use of these authorities) (see Part 27).

48 C.F.R. § 6.302-1(b)(2).

[32] The court was advised by Airbus' counsel during Oral Argument that the term "Independent Government Estimate" is defined in FAR Part 15, but Airbus' counsel did not have a copy of the FAR in hand and was unable to provide the court with a specific FAR citation. 6/9/16 TR at 55. The court's subsequent independent research, however, revealed that the term "Independent Government Estimate" is not defined in the FAR, nor has the United States Court of Appeals for the Federal Circuit nor GAO attributed any special meaning, so that the plain meaning must govern. *See* BLACK'S LAW DICTIONARY 887 (10th ed. 2014) (defining independent as "[n]ot subject to the control or influence of another <an independent investigation>").

surprise, since the IGE was prepared by a commercial firm that has *only* federal agencies as customers, prominently listing the Army as a major customer, and touts that "Tecolote Has Successfully *Supported* Over 340 Higher Headquarters' Reviews since 1973." *Milestone Reviews*, TECOLOTE RESEARCH, INC., https://www.tecolote.com/About/MilestoneReviews.html (last visited Aug. 12, 2016) (emphasis added).

In addition, in the Government's June 22, 2016 Supplement to the Administrative Record, the court found an unmarked document, stating that $[REDACTED] was the price of "current ROM for a[n] upgraded CPT from Airbus." AR Tab 63, at 5076. On July 1, 2016, the Government submitted a Declaration from Gregory W. Segraves, a Technical Manager for Tecolote Research, Inc., who "develop[ed] [the] Independent Cost Estimates *to support [the Army's] contract actions*." ECF No. 116-1, at 2 (emphasis added).[33] Mr. Segraves was tasked with preparing an IGE of "the delta of costs that would be incurred if [the Army] were to use an alternative aircraft instead of the UH-72A Lakota for a sole source follow-on acquisition[.]" ECF No. 116-1, at 2. In performing this calculation, Mr. Segraves decided to include the cost for the UH-72A CPT as an analogous cost for the alternative aircraft (AgustaWestland). To obtain this information, Mr. Segraves asked Airbus' Lakota Product Office Manager for a ROM cost to purchase a new CPT, with upgrades. The Airbus Product Office Manager apparently contacted another Airbus employee who provided a $[REDACTED] million estimate that was used by Mr. Segraves in his Microsoft Excel spreadsheet calculations. ECF No. 116-1, at 3. Tecolote Research Inc.'s certification, however, states that the IGE was "independently prepared" and "there has been no discussion with any prospective sources." AR Tab 32, at 2910. We now know from Mr. Segraves' Declaration that was not true. The IGE also did not consider the August 19, 2015 National Commission on the Future of the Army's conclusion that, although "the decision to employ the UH-72 as an Army primary trainer may be warranted, "[s]uitable and less expensive primary trainers are available." Pl. Ex. 28, at 2.[34] And, the IGE's $[REDACTED] million cost estimate was based on a performance period of 25 years, *i.e.*, from FY16 to FY41. AR Tab 32, at 2908. The Total Delta Cost impact for FY16, *i.e.*, one year according to the IGE's calculations, should be no more than $31.4 million, assuming that estimate was not inflated, which is impossible to ascertain without examining the underlying data and analysis.[35]

The third major reason cited in the December 10, 2015 J&A for not submitting this procurement for "full and open competition" is the IGE's estimate that there would be a three year delay, if these 16 helicopters were competitively sourced. *Compare* AR Tab 33, at 2916, *with* AR Tab 32, at 2908. The IGE, however, did not consider why it only took the Army from July 26,

---

[33] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with the Segraves Declaration, which establishes that the IGE certification was not accurate.

[34] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with this public document, which is otherwise subject to Fed. R. Evid. 201(b).

[35] The court's request for the underlying documents to substantiate the IGE's calculation was completely ignored by the Government.

2005 to June 30, 2006—less than one year, to issue a SOW, a Solicitation, and enter into the 2006 Contract initially to procure up to 45 helicopters, but would now take three times that amount of time to procure just 16 helicopters. Therefore, the time/cost of a competitive procurement should be approximately one year, not three years as the IGE estimated or 25 months, as the December 10, 2015 J&A estimated. *Compare* AR Tab 32, at 2908, *with* AR Tab 33, at 2914. Finally, the J&A concluded that the delay in seeking competitive bids for these 16 training helicopters "introduces risk to the nation's security and safety." AR Tab 33, at 2916. As the court commented during Oral Argument: "That is an overstatement[,] if I've ever heard one." 6/9/16 TR at 28.

The J&A also represented that market research confirmed that Airbus was the only potential source for UH-72A Lakota helicopters. AR Tab 33, at 2918–19. In response to the court's request to review the underlying market documents, the Government provided copies of 2014–2015 periodicals that contain no more information about procuring new training helicopters than a high school student could find in a local library. ECF No. 112, at 3–4.[36] The Government also informed the court that market research was conducted by the Army's attendance at the 2015 AAAA Army Aviation Mission Solutions Summit. ECF No. 112, at 3.[37] But, this statement provided no details about what the Army learned at this "Summit" and how it contributed to market research due diligence required by FAR 6.303-2(b)(8).[38]

Several other issues require comment. The Government contends that the court's request to supplement the Administrative Record with the affidavit of the SCA and review his underlying analysis (ECF No. 105) was extraneous to judicial review, because it reflects the Army's "predecisional process." ECF No. 112, at 2–3.

This is not the first bid protest where the court has been informed by the Government that the court can only consider an "Administrative Record" compiled by the Government. This is tantamount to a defendant informing the plaintiff that it is entitled only to the discovery that the defendant deems relevant. This approach turns the Federal Rules of Civil Procedure on its head and in many cases undermines the court's ability to conduct meaningful review under the APA standard. It is well-established that "the focal point for judicial review should be the [A]dministrative [R]ecord *already in existence*, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (emphasis added). And, as the United States Court of Appeals for the Federal Circuit observed, "The purpose of limiting review to the record *actually before the agency* is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Axiom*, 564 F.3d at 1380

---

[36] The court has determined that it cannot conduct "effective judicial review," without supplementing the Administrative Record with information confirming the nature and extent of "market research" conducted by the Army to support the December 10, 2015 J&A.

[37] *Ibid.*

[38] FAR 6.303-2(b)(8) provides, "As a minimum, each justification . . . shall include . . . (8) [a] description of the market research conducted . . . and the results or a statement of the reason market research was not conducted." 48 C.F.R. § 6.303-2(b)(8).

(quotations omitted) (emphasis added).[39]   In the court's judgment, the analysis conducted by the SCA and/or his Staff Analyst in this case are part of the Administrative Record "in existence" and "actually before the agency."  *Id.*  Therefore, review of such documents is well within the United States Supreme Court's delineation of what is in the Administrative Record.  The court recognizes that the Government is entitled to assert the deliberative process privilege, where appropriate, but

---

[39]  The United States Court of Appeals for the Federal Circuit held in *Axiom* that the trial court abused its discretion in not explicitly making a determination that it could not conduct "effective judicial review" *prior* to determining "whether supplementation of the record was necessary."  *Axiom*, 564 F.3d at 1381.  Following *Axiom*, however, the Government has insisted that the court must make a "supplementation was necessary" finding, whenever the court requests a clarification, explanation, or other documentation to verify information contained in the Administrative Record.  *See, e.g.*, ECF No. 125, at 1–2.  The court reads *Axiom* to require that the court make the "supplementation . . . was necessary" determination in the merits decision, at the same time it rules on whether or not supplementation of the record is indeed required.  Otherwise, the court could be unnecessarily burdened with making "supplementation determinations," as it conducts an ongoing review of the Administrative Record, which often is voluminous, as was the case here.  Moreover, this court has an informal rule that decisions on the merits should be issued no later than three months after the last filing; but in bid protest cases that time usually is truncated.  As such, it would be physically impossible and a waste of judicial resources to require "supplementation . . . was necessary" rulings *seriatim*, instead of in the final merits decision, which the court has done here.

On a different note, in subsequent cases citing *Axiom*, several important facts have been overlooked.  First, in *Axiom*, the bid protest concerned whether there was an organizational conflict of interest.  Necessarily, evidence of this type of FAR violation will *not* be found in the Administrative Record.  Second, the court supplemented the record with five declarations, four of which were filed with and considered by the GAO in a prior related proceeding.  Therefore, these declarations, may have been subject to judicial notice under Fed. R. Evid. 201(b) or automatic inclusion in the record pursuant to RCFC Appendix C ¶ 22(u).  Third, in most cases subject to APA review, the Administrative Record concerns an agency rulemaking or other comprehensive agency proceedings, such as those conducted by the Federal Energy Regulatory Commission, the Environmental Protection Agency, the Federal Trade Commission, or the Federal Communications Commission.  The Administrative Record in those proceedings include volumes of agency analysis, public comment, and quasi-judicial hearings.  Therefore, the qualitative nature and reliability of those Administrative Records is far different from what the Government typically proffers in bid protest cases.  This too should be a relevant factor to be considered in determining whether the trial court abused its discretion by supplementing the Administrative Record.  The court is aware of no federal statute or FAR regulation that states that the Administrative Record in a bid protest should be identified and certified in the sole discretion of the federal agency being challenged.  But, in practice that is the reality in bid protest cases when the burden is shifted to the trial court to establish a need, either for more agency records or extra-record evidence to discharge its duty to conduct "meaningful judicial review."  Administrative review in bid protest cases need not entail the type of discovery required in complex federal civil matters, but a better balance needs to be struck.

such documents should be made available for *in camera* inspection. Otherwise, the Government can avoid judicial review as to whether the agency conducted *any* analysis, simply by asserting privilege. Conclusory statements or a contracting official's signature on a J&A does not provide the court with the ability to ascertain whether the agency's decision not to conduct a competitive procurement was rational. *See Savantage*, 595 F.3d. at 1286 (holding that an agency action must evidence rational reasoning and consideration of "relevant factors"). In this case, the Government claimed such privilege as to the SCA. ECF No. 112, at 2–3. Because the Administrative Record otherwise established that the December 10, 2015 J&A did not support the Army proceeding without "full and open" competition, and not to delay resolution of this bid protest, the court decided not to order the Army to produce the documents on which it claimed privilege. The court's impression, however, is that the SCA, in fact, conducted no independent analysis, but instead suggested only minor procedural revisions to the December 10, 2015 J&A identified by the SCA's staff analyst, none of which reflected any competitive analysis. AR Tab 46, at 3798–99; AR Tab 47, at 3801–03.

Finally, since the entire purpose of a J&A is to explain and justify why competition is not required for a procurement, the Contracting Officer's decision that "the justification [is] adequate to support other than full competition," *prior* to the review and approval of Legal Counsel and the SCA *prima facie* was arbitrary and capricious. *Compare* AR Tab 33, at 2912 (showing that the Contracting Officer approved the J&A on April 16, 2015), *with* AR Tab 45 at 3797 (stating that the SCA did not approve the J&A until June 29, 2015), *and* AR Tab 33, at 2913 (showing that the Legal Counsel did not approve the J&A until September 2, 2015), *and* AR Tab 33, at 2923 (showing that the Senior Procurement Executive approved the J&A without noticing this oversight).

For these reasons, individually and collectively, the court has determined that the Army's December 10, 2015 J&A and decision to purchase 16 LUHs, without "full and open" competition violates 10 U.S.C. § 2304(a) and FAR 6.3.

### 4.     Count IV.

Count IV of the Supplemental Complaint alleges that the Army arbitrarily established as "unduly restrictive of competition" the "UH-72A as the only helicopter that can meet the Army's need for training or for additional [LUHs]" not subject to the 2006 Contract. Supp. Compl. ¶ 107. In addition, Count IV also alleges that the Army violated 10 U.S.C.§ 2305(a)(1) by imposing "an overly restrictive requirement on competition by limiting its procurement of at least 110, and as many as 126 UH-72A helicopters as its initial pilot training helicopter to the exclusion of other capable models." Supp. Compl. ¶ 108.

To the extent the claim in Count IV, Supp. Compl. ¶¶ 106–08, concerns the Army's purchase of 110 UH-72A Lakota helicopters, under options to the 2006 Contract, the court does not have jurisdiction to adjudicate such a claim, since those option years were within the scope of the 2006 Contract and do not raise a viable protest under § 1491(b)(1). *See Distributed Sols.*, 539 F.3d at 1346.

As for Count IV, Supp. Compl. ¶ 109, the court has jurisdiction to adjudicate AgustaWestland's claim that the Army's decision to limit the procurement of 16 LUH only to UH-72A Lakota helicopters, violates 10 U.S.C. § 2305(a)(1), but the court considers Count IV redundant of Counts II and III.

For these reasons, the court has determined that Count IV must be dismissed. *See* RCFC 12(b)(1).

### 5.    Count V.

Count V of the Supplemental Complaint alleges that the Army "abandoned[] its *obligatory requirements development process* in an effort to shortcut the procurement process." Supp. Compl. ¶ 111 (emphasis added). AgustaWestland seeks a declaration that this decision, as well as the Army's failure to "*create and validate an acquisition strategy* for the acquisition, and by not following the mandatory Capability Requirements process to document, validate and approve the requirements for the Army's training helicopter," violated some unspecified provision of the FAR and Department of Defense Instruction ("DoDI") 5000.02.

AgustaWestland argues in the March 8, 2016 Motion For Judgment On The Administrative Record that the Army failed to comply with FAR 17.207(f) when it exercised options under the 2006 Contract that "resulted in sole source contract," without a J&A analysis. Pl. Mot. JAR at 21–23. But, not every provision of the FAR provides a private contractor a cause of action. The United States Court of Appeals for the Federal Circuit has held that "[i]n order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor." *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000). In *Freightliner*, the United States Court of Appeals for the Federal Circuit held that FAR 17.207(f) "exists to ensure that the [C]ontracting [O]fficer acts in the best interest of the government . . . not . . . for the benefit of the contractor." *Id.* FAR 17.207(f) "does not proscribe the [C]ontracting [O]fficer from taking a particular action, rather it provides the Government with a mechanism for maintaining orderly business transactions." *Id.*

To the extent Count V requests that the court interfere with the Army's internal development process or mandate that the Army initiate an acquisition strategy regarding acquiring an Army training helicopter, the court does not have jurisdiction to adjudicate matters of policy under Section 1492(a)(1). Nor does AgustaWestland have standing to enforce DoDI 5000.02, as like DoDI 5000.01, it is one of a group of "cautionary and informative regulations and directives [that] provide any internal governmental direction." *Am. Tel & Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002).

> [D]irectives provide only internal governmental direction. . . . . [T]he fact that a . . . practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant . . . officials within the agency . . . [and not] by this court.

*Id.* (citations omitted) (internal quotations omitted).

Therefore, AgustaWestland does not have standing to request an adjudication of DoDI 5000.02.

For these reasons, the court has determined that Count V of the Supplemental Complaint must be dismissed. *See* RCFC 12(b)(1).

## III. AGUSTAWESTLAND IS ENTITLED TO INJUNCTIVE RELIEF.

To determine if an injunction is warranted, the court must consider whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) ("*No one factor*, taken individually, *is necessarily dispositive* . . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of others.") (emphasis in original); *see also* RCFC 65(a).

As to success on the merits, based on a review of the Administrative Record, as amended and supplemented, the court has determined that AgustaWestland has established success on the substantive merits as to Counts II and III of the Supplemental Complaint, except for Paragraph 102. *See, e.g., Google, Inc. v. United States*, 95 Fed. Cl. 661, 679 (2011) (determining that the Department of Interior's Standardization "Determination and Findings" on which a Limited Source Justification award was based would achieve "organizational lock-in," excluding another competitor of the "opportunity to compete" in violation of the CICA and FAR 6.303-2(a)(4); 6.303-2(a)(7); 6.303-2(a)(10), and 6.303-2(a)(11)); *see also Savantage Fin. Servs, Inc. v. United States*, 81 Fed. Cl. 300, 306–08 (2008) (determining that the Department of Homeland Security's decision to use financial management software systems of two incumbent contractors by means of a brand name justification to standardize the agency's financial software programs was an improper sole source procurement that violated the CICA).

As to irreparable harm, without a preliminary injunction, an award of the 16 helicopters at issue, without competition, will preclude AgustaWestland and other manufacturers of LUHs from an opportunity to compete. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 644 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm[.]"). AgustaWestland and other potential competitors are not entitled to be awarded a contract, but they are entitled to demonstrate the competitive benefits of their products, particularly since there may have been technical advances and/or reduction in the cost of their products in the last decade, and the life span of the UH-72A Lakota helicopters has been estimated to be between 21 and 25 years. Therefore, it may be many years before another major purchase is made by the Army. The second factor weighs in favor of an injunction.

As to the balance of hardships to the respective parties, the part of the April 3, 2014 Executive Order 109-14, standardizing on the UH-72A Lakota helicopters as the "only one responsible source" for the Army's Instruction Training Aircraft, and the December 10, 2015 J&A violated the CICA and FAR. These violations prejudiced AgustaWestland's economic interests. The Army could have began the process to purchase these 16 helicopters subject to "full and open competition" in 2014 or earlier. Instead, the Army proceeded to "standardize" on Airbus' UH-

72A Lakota helicopter, as the "only one responsible source" for procuring Institutional Training Helicopters, endorsed a flawed IGE, and misrepresented the statutory and regulatory authorization for the December 10, 2015 J&A, among other deficiencies. If there is a genuine need for the 16 LUHs at issue—or perhaps a larger number—the most efficient way for the Army to proceed is to commence a competitive procurement. The Army should be in a position to issue a solicitation, evaluate bids, and issue a new contract in short order, if the Army acts with the same dispatch as it awarded the 2006 Contract—to avoid any disruption in the training program. ECF No. 71-1, at 2 (indicating that the Army will be still receiving UH-72A Lakota helicopter purchases under the 2006 Contract until December 2017).

As to the public interest, in light of the reasous stated herein, the court has determined that, the public interest is best served by the issuance of a preliminary injunction to ensure that the Army complies with the CICA and FAR.

## IV. CONCLUSION.

For reasons discussed herein, the Government's March 29, 2016 Motion To Dismiss, is granted, in part, as to Counts I and IV and Paragraph 102 of Count III of the Supplemental Complaint, but otherwise is denied. AgustaWestland's March 8, 2016 Motion For Judgment On The Administrative Record is granted as to Counts II and III, other than Paragraph 102 of the Supplemental Complaint. All other pending motions are denied as moot.

In addition, it is hereby ordered that the United States Army is preliminarily enjoined from proceeding with or awarding a contract to Airbus for 16 UH-72A Lakota helicopters, pursuant to the Executive Order 109-14 and/or the December 10, 2015 J&A For Other Than Full And Open Competition, and this procurement is remanded for six months to the Army to: (1) proceed with a competitive procurement; (2) reissue a new Justification and Approval For Other Than Full And Open Competition, correcting the deficiencies identified herein and conducting a new Independent Government Estimate; or (3) not proceeding with this procurement. It is further advised that proceedings in this case are stayed during the remand, except that the Government will provide the court with a report on the status of the remand every 90 days. *See* RCFC 52.2.

No costs.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**